**In re James WOOD, Debtor.**

**Bankruptcy No. 1–80–2014.**

United States Bankruptcy Court,
E.D. Tennessee, S.D.

Sept. 15, 1982.

William Crutchfield, Jr., Chambliss, Bahner, Crutchfield, Gaston & Irvine, Chattanooga, Tenn., for Retirement Plan for Production & Maintenance Hourly-Rated Employees of the Chattanooga, Tenn. Plant of the Rockwell Intern. Foundry; William H. Powderly, III, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., of counsel.

Charles Knight, Chattanooga, Tenn., for James Wood, debtor.

Lawrence R. Ahern, III and Harry S. Mattice, Jr., Miller & Martin, Chattanooga, Tenn., for C. Kenneth Still, trustee.

W. Thomas Dillard, U.S. Atty., Knoxville, Tenn., and Robert E. Rice, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., amicus curiae.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

This Chapter 13 case came to be heard on the motion of The Retirement Plan for Production and Maintenance Hourly-Rated Employees of the Chattanooga, Tennessee Plant of the Rockwell International Foundry, requesting the Court to reconsider its Order of May 18, 1981, directing the Plan to pay pension benefits of the debtor in this case directly to the debtor's Chapter 13 Trustee. For the reasons stated below, the Court denies the motion to reconsider.

The facts in this case are simple and undisputed. James Wood, the debtor, was formerly employed at the Chattanooga, Tennessee plant of Rockwell International Corporation. At the time of Mr. Wood's retirement on June 1, 1977, he was employed in the production and maintenance unit at that facility. During the period of the debtor's employment, the production and maintenance unit of the Chattanooga plant was represented by the United Steelworkers of America as its duly authorized bargaining agent. As a result of negotiations between Rockwell and United Steelworkers, the Chattanooga plant of Rockwell maintains a contributory retirement plan for its production and maintenance employees. This retirement plan is administered by Rockwell. Chase Manhattan Bank serves as trustee of plan assets. The retirement plan and the trust form a single entity, hereinafter referred to as "the Plan," which constitutes an employee pension benefit plan as that phrase is defined by section 3(2) of The Employee Retirement Income Security Act of 1974 (ERISA). Since its inception, the Plan has complied with the applicable requirements of the Internal Revenue Code ("IRC") and has thereby constituted a qualified plan pursuant to section 401(a) of the Code. The effect of a plan being "qualified" under section 401(a) is that it is treated as a tax-exempt trust under section 501(a). The Internal Revenue Service has issued to Rockwell its determination that the Plan complies, in form, with the requirements for qualification as a tax-exempt plan.

IRC section 401(a) contains several requirements that an employee benefit plan must meet, both in form and in operation, in order to obtain and retain qualified status. Of particular importance to this case is the provision contained at section 401(a)(13), which states:

A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. For purposes of the preceding sentence, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment made by any participant who is receiving benefits under the plan unless the assignment or alienation is made for purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if

such loan is secured by the participant's accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 (relating to tax on prohibited transactions) by reason of section 4975(d)(1). This paragraph shall take effect on January 1, 1976 and shall not apply to assignments which were irrevocable on September 2, 1974.

Mr. Wood was and is a participant in the Plan. Under the terms of the Plan, Mr. Wood, upon his retirement from Rockwell, became entitled to a pension in the amount of $350 per month, which amount was and still is paid through the trust. On November 13, 1980, Mr. Wood filed a petition with this Court for relief under Chapter 13 of the Bankruptcy Code. His Chapter 13 plan provided for submission of such portion of his monthly retirement benefits to the supervision and control of the Standing Chapter 13 Trustee as was necessary for the execution of the plan. This Court, finding that the debtor's plan complied with 11 U.S.C. § 1325(a), confirmed the plan. On May 18, 1981, the Court issued an order, pursuant to 11 U.S.C. § 1325(b), ordering the Plan to deduct and remit to the Chapter 13 trustee the sum of $300.00 per month. On June 22, 1981, the Plan filed the motion to reconsider that order which is the subject of this dispute. The essence of the motion to reconsider is that the Plan cannot comply with the Court's order without violating certain provisions of the Internal Revenue Code, compliance with which is necessary for the Plan to maintain its tax-qualified status.

Briefly stated, the issue in this case is whether a Bankruptcy Court, pursuant to 11 U.S.C. § 1325(b), may order a retirement plan, which is a "qualified plan" pursuant to IRC § 401, to pay benefits due a retiree directly to a Chapter 13 Trustee. This issue revolves around an apparent conflict in the provisions of Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 et seq., and certain provisions of the Internal Revenue Code which are substantially derived from the Employee Retirement Income Security Act of 1974, Public Law No. 93–406 ("ERISA"). Because such a conflict must be resolved by an examination of the legislative intent, a review of the two pieces of federal legislation involved is in order.

The present Chapter 13 was enacted as part of the Bankruptcy Reform Act of 1978, the most comprehensive restructuring of the nation's bankruptcy laws in this century. The development of Chapter 13 exemplifies, perhaps more than any other portion of the new Code, the fundamental changes in approach of the new law. In its 1978 action, Congress expanded the category of individuals who could file Chapter 13 plans, the types of property available for carrying out a plan, and the power of the Bankruptcy Court in administering a plan. See generally, 5 Collier on Bankruptcy ¶¶ 1300.01 & 1300.02 (15th ed. 1981). In this regard, the thrust of new Chapter 13 clearly favors the debtor, and "[t]he flexibility permitted in the formulation of Chapter 13 plans is a central element in the implementation of the congressional goal of encouraging expanded use of Chapter 13." 5 Collier on Bankruptcy ¶ 1322.01[1], citing H.R. Rep. No. 595, 95 Cong., 1st Sess., 117–18 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

Two apposite examples of Congress' intent in enhancing the scope and attractiveness of Chapter 13 is its expansion of the concepts of "property of the estate," and of an "individual with regular income."

An essential difference between a liquidation proceeding under Chapter 7 and a Chapter 13 case is the contemplation of a continuing process of financial rehabilitation of the debtor, rather than a static and isolated transfer of assets from the estate of the debtor to his creditors. For this reason, the definition of "property of the estate" in a Chapter 13 proceeding is broader than the definition in a Chapter 7 case, which is contained at section 541:

Property of the estate includes, in addition to the property specified in Section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case

but before the case is closed, dismissed, or converted to a case under Chapter 7 or 11 of this title whichever occurs first

. . . . .

11 U.S.C. § 1306(a).

This concept of an ongoing process of collection and payout of the debtor's assets in a Chapter 13 proceeding is informative in the instant case. The Plan has objected to inclusion of debtor's retirement benefits in the "property of the estate" on the grounds that to do so would be to anticipate such benefits in contravention of the spendthrift provisions of the Plan. The Plan does not dispute, however, and in fact concedes, that once these benefits were reduced to the possession of the debtor, they would immediately become "property of the estate," and would be available to the trustee.

As the Plan correctly points out, the section 1306 definition of "property of the estate" incorporates the definition of section 541. Section 541(c)(2) states: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." The Plan correctly points out that this provision serves to exclude assets of a spendthrift trust from property of the estate. S.Rep. No. 95–989, 95th Cong., 2d Sess. 83 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787. The Plan then argues that by virtue of IRC § 401(a)(13), a qualified pension plan should be treated, for certain purposes, as a spendthrift trust in favor of the pensioner. From this line of reasoning, the Plan concludes that the pensioner's qualified pension benefits should not be treated as "property of the estate" in a Chapter 13 case, and thus that a bankruptcy court's withholding order in favor of a Chapter 13 Trustee cannot be issued to the trustees of a qualified pension plan.

Though the Plan's line of reasoning is sound in the context of a Chapter 7 liquidation, and in fact articulates the purpose of subsection 541(c)(2), it overlooks the essential difference between a Chapter 7 liquidation and a Chapter 13 rehabilitation and as a result ignores the reasons for defining "property of the estate" in Chapter 13 cases more expansively than it is defined in § 541.

The court has been cited to no authority to support such an analogy, but finds persuasive and accepts the Plan's argument that ERISA's anti-alienation language calls for treating a qualified plan like a spendthrift trust under state law. It is true that a bankruptcy trustee can assert no claim to the corpus of a spendthrift trust. This is because of section 541(c)(2). It addresses itself primarily to the situation in a Chapter 7 liquidation case, in which the "property of the estate" is determined as of a frozen moment in time. Property subsequently acquired by the debtor is generally not property of the estate. But see 11 U.S.C. § 541(a)(5)–(a)(7). Thus, the more important asset of a spendthrift trust is the corpus which is retained in trust, not the periodic distributions.

A Chapter 13 case, however, contemplates a continuing process during which income of the debtor will be collected and turned over to creditors on an orderly schedule. It is for this reason that section 1306(a) expands the definition of "property of the estate" to include "all property of the kind specified in such section that the debtor acquires after the commencement of the case, but before the case is closed. . . ." 11 U.S.C. § 1306(a)(1).

It may readily be seen that since there are likely to be many distributions from a qualified pension plan to a pensioner/debtor during the period of time that the debtor's Chapter 13 plan is being administered, the prohibition against bankruptcy encroachment into the corpus of the spendthrift trust loses its significance. This is because the Chapter 13 Trustee never seeks to, and under subsection 541(c)(2) cannot reach the corpus of the spendthrift trust. The Chapter 13 Trustee merely seeks to reach those distributions from, and free of, that trust to which the debtor would otherwise be entitled. In this respect, the situation at bar is not substantively different from that in which the Chapter 13 debtor receives his income in the form of wages from an em-

ployer. In the case of a plan funded by wages, the Chapter 13 Trustee does not lay claim to the general assets of the employer. The Trustee refrains from asserting such a claim not because of a prohibition in a trust instrument, but simply because an employee has no claim until his labor is performed.

So it is in the instant situation. The Chapter 13 Trustee does not assert a claim against those assets of the qualified pension plan that are held subject to the provisions of IRC § 401(a)(13). Rather, the Chapter 13 Trustee asserts a claim only to those assets that have been separated from the Plan and are to be paid over to the debtor.

■ Another significant change wrought by the Bankruptcy Reform Act of 1978 was to expand the class of individuals eligible to participate in a Chapter 13 plan from merely "wage earners" to any "individual with regular income." 11 U.S.C. § 101(24) defines an "individual with regular income" as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under Chapter 13 of this title...." That Congress intended that individuals whose only source of income is pension benefits should be able to participate in a Chapter 13 plan is made abundantly clear by the legislative history to section 101(24). In commenting on that section, both houses of Congress observed:

The effect of this definition, and its use in Section 109(e), is to expand substantially the kinds of individuals that are eligible for relief under Chapter 13, Plans for Individuals with Regular Income, which is now available only for wage earners. The definition encompasses all individuals with incomes that are sufficiently stable and regular to enable them to make payments under a Chapter 13 plan. Thus, individuals on welfare, Social Security, *fixed pension incomes,* or who live on investment incomes, will be able to work out repayment plans with their creditors rather than being forced into straight bankruptcy.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 311–12 (1977); see, S.Rep. No. 95–989, 95th Cong., 2nd Sess. 24 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5810, 6269 (emphasis added).

Finally, in addition to expanding the range of individuals and property within the ambit of Chapter 13, the Bankruptcy Reform Act of 1978 specifically expands the power of the Bankruptcy Court beyond its former power to reach only wages of wage-earners. The relevant provision of the Bankruptcy Code states: "After confirmation of a plan, the Court may order *any entity from whom the debtor receives income* to pay all or any part of such income to the Trustee." 11 U.S.C. § 1325(b) (emphasis added).

Two observations should be made about this language. First, it should be noted that the words "any entity" suggest the absence of any immunity from the reach of a Bankruptcy Court's Chapter 13 withholding powers. Second, the modifier "from whom the debtor receives income" indicates that the withholding power of the Court, in a Chapter 13 case, is not restricted to entities which possess "property of the estate." As pointed out above, a qualified pension plan does not possess property of the estate; the debtor, however, undeniably does receive income from the Plan. In this case, then, section 1325(b) is certainly broad enough to sustain the Court's withholding order to the Plan.

■ Based on all of the foregoing, it is the determination of this Court that the applicable provisions of the Bankruptcy Code are sufficiently broad to reach pension benefits of a Chapter 13 debtor. Moreover, it is clear that under the Bankruptcy Code, a Bankruptcy Court may issue a withholding order to the trustees of a qualified pension plan. The Internal Revenue Code is, however, a federal statute of equal dignity with the Bankruptcy Code. It is thus necessary to examine those portions of the IRC which are derived from ERISA to see whether a conflict exists, and if so, which expression of Congressional intent should control the issue in this case.

The Employee Retirement Income Security Act of 1974 (ERISA) represented the most comprehensive overhaul of pension and employee benefit rules in history. Primary among the goals of ERISA was to establish a legal framework that would provide workers with some degree of assurance that benefits would be available to such workers in their retirement years. H.R. Rep. No. 93–807, 93rd Cong., 2d Sess. 68 (1974), U.S.Code Cong. & Admin.News, p. 4639. As pointed out in briefs submitted by the Plan and by the United States as *amicus curiae,* it is apparent that Congress, in enacting IRC § 401(a)(13), sought to ensure that anticipated retirement benefits would in fact be available at retirement to function as a source of income to retired employees and their families. In order to encourage implementation of this policy, Congress employed the threat of loss of tax-exemption to a plan that would allow a participant to assign or otherwise alienate his pension benefit. To this end, Congress provided, in IRC § 401(a)(13) that "a trust shall not constitute a qualified trust under this Section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated."

The provision of the Rockwell plan that implements this statutory requirement states:

No right or benefit provided for in this Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void. Except as provided in Section 14.040, no such right or benefit shall be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to such right or benefit. No such right or benefit shall be subject to garnishment, attachment, execution or levy of any kind. If any Participant or Spouse shall become bankrupt or shall attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge such right or benefit, or if the right or benefit to which such person may be entitled should be held by any court to be subject to garnishment, attachment, execution or levy of any kind, then in the discretion of the Retirement Committee such right or benefit shall cease and terminate and the same shall be held or applied, in whole or in part, to or for the benefit of such Participant or his Spouse, children or other dependents, or any of them, in such manner and in such proportion as the Retirement Committee shall deem proper. Any payment so made or applied shall be conclusively deemed to have been made for the benefit of such Participant or Spouse, as the case may be.

Pursuant to authority granted to him under ERISA, the Secretary of the Treasury has promulgated the following legislative regulation interpreting IRC § 401(a)(13):

(b) *No assignment or alienation*—(1) *General rule.* Under section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process.

Treas.Regs. § 1.401(a)–13.

It can hardly be disputed that on their face, the 1974 statutory prohibition of assignment, the plan provision implementing this prohibition, and the Treasury Department's legislative regulation were, prior to the Bankruptcy Reform Act of 1978, broad enough to preclude a pay-status participant in a qualified pension plan from assigning his benefits to a Chapter 13 Trustee. The issue remains, however, whether the ERISA prohibition on alienation is sufficient to overcome the clearly expressed intention of Chapter 13 of the Bankruptcy Code and thus preclude a Bankruptcy Court from enforcing a section 1325(b) withholding order against a qualified pension plan.

In its *amicus curiae* brief arguing against enforcement of the Court's Order of May 18, 1982, the United States cites the case of *In the Matter of Parker,* 473 F.Supp. 746

(W.D.N.Y.1979), as supporting the proposition that a bankrupt's contributions to a qualified pension plan would not constitute property of the estate which would pass to the trustee in Bankruptcy under the old Bankruptcy Act. In reaching its conclusion that such contributions did not pass to the bankruptcy trustee, the District Court stated that "the first and foremost factor in [its] decision [was] the purpose underlying ERISA of preserving income for retirement years." 473 F.Supp. at 750. The weight attributed to this factor by the Court resulted from the Court's examination of the three leading Supreme Court decisions dealing with the question of what constitutes property of the bankrupt, *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), and *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). These cases, and particularly the first two, analyzed the "property of the estate" question by reference to the "dual purpose" theory of the bankruptcy law. That theory proceeds from the premise that the function of the bankruptcy laws is both to secure relief for the bankrupt's creditors and to provide the bankrupt with the ability to make a "fresh start" in his future financial dealings.

It is in the context of this "fresh start" analysis that *In the Matter of Parker*, and other cases like it, are clearly distinguishable from the case at bar. *Parker*, as well as *In the Matter of Turpin*, 644 F.2d 472 (5th Cir. 1981) and *In re Donaghy*, 11 B.R. 677 (Bkrtcy.Ct.S.D.N.Y.1981), cases cited in the Plan's supplemental brief, are Chapter 7 cases. As with the concept of "property of the estate," the concept of a "fresh start" in a Chapter 7 case is essentially different from the same concept in a Chapter 13 case.

In a Chapter 7 case, the debtor receives a fresh start by the immediate extinguishment of all debts incurred prior to the filing of the petition in bankruptcy. All income received by the debtor after this immediate extinguishment is immune from the claim of creditors. In a Chapter 13 case, on the other hand, there is no immediate extinguishment of all liability of the debtor.

Rather, the debtor receives his "fresh start" only after that period of his plan during which he has contributed his income, on a continuing basis, to his trustee and thus his creditors, in order to accomplish the rehabilitation of his financial status that is the goal of a Chapter 13 plan. Thus it can be seen that the same type of immunity of subsequent earnings that attaches to the post-petition income of a Chapter 7 debtor does not attach to the income of a Chapter 13 debtor. Although the subsequent income that is at issue in the cases mentioned above and in the case at bar is pension benefits, it can be seen that the reasoning of those cases, developed in the legal context of Chapter 7, cannot be applied to a Chapter 13 case.

One other point should be made about the Plan's and the United States' reliance on the Chapter 7, fresh-start line of reasoning. If the object of the debtor in seeking the refuge of the Bankruptcy Code is to obtain a "fresh start" and if pension benefits are not available for use in a Chapter 13 plan, then a pensioner/debtor with severe financial difficulties will be left with no alternative but to declare straight bankruptcy under Chapter 7, and suffer the consequences, which, without enumerating them, are more onerous than would result from completing a successful Chapter 13 plan. In light of the obvious goals of the expansion of Chapter 13 as discussed above, it is difficult to believe that Congress intended that persons whose only source of income is pension benefits should effectively be precluded from availing themselves of the protection of Chapter 13 of the Bankruptcy Code.

Whether or not the cases cited by the Plan and the United States as descriptive of the proper relationship between the anti-alienation provisions of ERISA and the Bankruptcy Code are apposite to the case at bar, however, the fact remains that the bare language of ERISA itself, and the language of the Treasury's legislative regulation interpreting ERISA seem to prohibit, on their face, the very type of voluntary assignment of pension benefits to a Chapter 13 Trustee that is contemplated here. Cf.

*General Motors Corporation v. Buha,* 623 F.2d 455 (6th Cir. 1980). To this, the only answer can be, and the basis of this decision is, that the Bankruptcy Reform Act of 1978 implicitly amended ERISA insofar as ERISA can be read to prohibit the enforcement of an order of a bankruptcy court, directed to a pension plan trustee, to pay over a debtor's pay-status benefits to the Chapter 13 Trustee.

Congress' intended expansion of Chapter 13 has already been discussed. It was also discussed by this Court in the case of *In re Hughes,* 7 B.R. 791 (Bkrtcy.Ct.E.D.Tenn. 1980), which involved an issue closely analogous to the case at bar. In that case, this Court ruled that benefits under the Social Security Act can be used in a Chapter 13 plan and that the Court may order the Social Security Administration to pay the debtor's benefits to the Chapter 13 Trustee. The Court stated that:

Expansion of the class to whom Chapter 13 is available comports with the basic legislative goal: to encourage financially overextended individual debtors to make greater use of voluntary repayment plans and thereby improve debtor relief, by allowing ratable distribution of future income without necessarily liquidating their non-exempt assets, and creditor recovery by guaranteeing repayment of most, if not all, of the claims over an extended period.

7 B.R. at 793. See also *In re Buren,* 6 B.R. 744 (M.D.Tenn.1980) *aff'g* 4 B.R. 109, 6 B.C.D. 828, 2 C.B.C.2d 380 (Bkrtcy.Ct.M.D. Tenn.1980) (also approving use of Social Security funds to execute a Chapter 13 plan).

This clear expression of Congressional concern, coming, as it did, only four years after the passage of ERISA, would seem sufficient to indicate an implicit intention to modify the strict anti-alienation language of ERISA in this narrow situation.

Moreover, such a departure from the anti-alienation provisions of ERISA would not be without precedent, either in the case law or in the statutory and regulatory language itself. Courts have recently recognized that the strict anti-alienation provisions of ERISA conflict with public policy in the area of collection of court-ordered alimony and child support obligations. In the case of *American Telephone & Telegraph Co. v. Merry,* 592 F.2d 118 (2d Cir. 1979), the Court of Appeals for the Second Circuit found an implied exception to ERISA in the case of state court ordered alimony and child support payment. The *AT & T* court made clear the policy grounds for its decision:

The purpose of the proscription on alienation and assignment is to protect an employee from his own financial improvidence in dealings with third parties. The provision is not intended to alter traditional support obligations, but rather to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement.

592 F.2d at 124.

This Court fully concurs with this summary of the goals of the anti-alienation provisions of ERISA, and agrees with the *AT & T* court's finding of an implied exception thereto to protect the public interest in enforceability of support obligations. Indeed, it is in this same spirit that the Court today finds another implied exception to these provisions in the case of a Bankruptcy Court's withholding order in favor of a Chapter 13 Trustee. As pointed out previously, the enforcement of such an order can only serve to benefit the debtor/pensioner. It is undisputed that the debtor can retain these funds for his own uses once they are reduced to his possession; his creditors will then have access to them by garnishment. By making the funds available to the debtor's Chapter 13 Trustee, however, these funds are used to facilitate successful completion of the Chapter 13 route of financial rehabilitation that the debtor has voluntarily chosen. In this way, the debtor's pension benefits are being put to use to his best advantage.

Another exception to the anti-alienation provision is found on the face of IRC § 401(a)(13) itself, which allows a "voluntary and revocable assignment of not to

exceed 10 percent of any benefit payment...." Since the filing of a Chapter 13 petition is always a voluntary act on the part of the debtor, and since the debtor is free to terminate his Chapter 13 plan at any time that he sees fit to do so, this statutory exception to non-alienation differs from the exception in the case at bar only as to the amount of benefit at stake.

Arguably even more relevant, however, is a provision found in the Treasury Regulations promulgated under IRC § 401(a). Treasury Regulation § 1.401(a)–13(e) provides:

> *Special rule for certain arrangements* —(1) *In general.* For purposes of this section and notwithstanding paragraph (c)(1) of this section, an arrangement whereby a participant or beneficiary directs the plan to pay all, or any portion, of a plan benefit payment to a third party (which includes the participant's employer) will not constitute an "assignment or alienation" if—
>
> (i) It is revocable at any time by the participant or beneficiary; and
>
> (ii) The third party files a written acknowledgement with the plan administrator pursuant to subparagraph (2) of this paragraph.
>
> (2) *Acknowledgement requirement for third party arrangements.* In accordance with paragraph (e)(1)(ii) of this section, the third party is required to file a written acknowledgement with the plan administrator. This acknowledgement must state that the third party has no enforceable right in, or to, any plan benefit payment or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement). A blanket written acknowledgement for all participants and beneficiaries who are covered under the arrangement with the third party is sufficient. The written acknowledgement must be filed with the plan administrator no later than the later of—
>
> (i) 18 August 1978; or
>
> (ii) 90 days after the arrangement is entered into.

■ Identically, as noted above, the debtor may revoke the transfer of his benefits to the Chapter 13 Trustee at any time, simply by exercising his absolute right to dismiss his case. 11 U.S.C. § 1307(b). Certainly, the requirement that the "third party" under Regulation 1.401(a)–13(e) execute a written acknowledgement renouncing an enforceable right to pension plan benefits is not identical to the terms of Chapter 13. However, it is not inconsistent with the type of arrangement contemplated in the case at bar. As discussed above, the Chapter 13 Trustee must admit, as a matter of law, that he possesses no enforceable rights to the corpus of a qualified plan. He must also acknowledge that any enforceable right to a benefit payment that he might possess was entirely dependent on the debtor's decision to continue the Chapter 13 plan. It is not clear whether these acknowledgements would satisfy the requirements of Treasury Regulation § 1.401(a)–13(e)(2). The answer, however, is not essential to this decision. As previously stated, this decision rests on the Court's finding that Chapter 13 of the Bankruptcy Code creates an implied exception to the anti-alienation provisions of ERISA. The similarity of Regulation 1.401(a)–13(e)(2) to the framework of Chapter 13 procedure simply demonstrates that the debtor's assignment of his pension benefits to his Chapter 13 Trustee is not entirely outside of the contemplation of the anti-alienation provisions of ERISA.

The Plan has expressed great concern that its compliance with the Court's order of May 18, 1981 will subject its fiduciaries to claims of breach of fiduciary duty under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). In response to an identical issue, the Second Circuit in *AT & T,* supra, stated:

> [The Plan's fears of claims of breach of fiduciary duty] are unfounded in light of our judicial determination that an implied exception exists under the statute's own terms.... It has long been the rule that fiduciary conduct is subject to judicial guidance and that a fiduciary acting pursuant to a court's instructions is protected from assertions of breach of duty.

592 F.2d at 125 (citing III Scott on Trusts § 259, at 2217 (3d ed. 1967)).

The Plan has also expressed concern that compliance with this Court's order will cause it to lose its qualified status under IRC § 401(a). In support of this concern, the Plan has cited a private letter ruling, issued by the Internal Revenue Service to American Telephone and Telegraph Company, addressing a question substantially similar to the one presented here. In that letter ruling, the IRS stated that compliance with the Bankruptcy Court's withholding order would result in loss of its qualified status. The Plan, however, is in no way bound by the ruling cited. It is a well-established principle of administrative tax practice, announced by the Internal Revenue Service itself, that "a taxpayer may not rely on a ruling issued to another taxpayer." Rev.Proc. 79–45, § 17.01, 1979–2 C.B. 508. Further, the administrative position taken by the IRS in this private letter ruling is based on reasoning which this Court, for the reasons stated in this opinion, finds unsound.

One final point should be made. Throughout these proceedings, the Plan has argued that one way to avoid the issue in this case is to have the Court withdraw its Order and rather simply to allow the Plan pay its benefits over to the debtor and allow the debtor in turn to pay over the benefits to the Chapter 13 trustee. At the hearing on this matter, the Chapter 13 Trustee, who has had 14 years of experience in this area, testified as to the considerable practical difficulties of administering a Chapter 13 plan under circumstances such as those urged by the Plan. It was the opinion of the Trustee that the enforcement of a withholding order substantially increased the chances of successful completion of a Chapter 13 plan. Moreover, this Court notes from the Trustee's testimony, as well as from the Court's own experience and observation of Chapter 13 administration, that enforceable withholding orders are often critical to the efficient administration of a Chapter 13 program.

For all of the reasons stated above, an order will be entered herewith, denying the Plan's motion to reconsider the Court's withholding order of May 18, 1981.